

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed August 13, 2017**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **TRENDSETTER HR, LLC,** *et al*. | § | Case No. 16-34457-sgj11 |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

---

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
### ON DEBTORS' OBJECTION TO ZURICH'S PROOFS OF CLAIM

CAME ON FOR CONSIDERATION the Objection filed by Debtors Trendsetter HR, LLC, TSL Staff Leasing, Inc. and Trend Personnel Services, Inc. (collectively, "Trend") (Dkt. 107) to the Proofs of Claim filed by Creditors Zurich American Insurance Company and American Zurich Insurance Company ("Zurich").  After deliberating on the weight of the evidence submitted on June 22, 23, 28, and 30, 2017, and based upon the Court's assessment of the credibility and knowledge of the nine different witnesses, the Court finds, concludes and Orders as follows:

## FINDINGS OF FACT

### I.    BACKGROUND

#### A.    Trend's Business

1.    Trend is a professional employment organization or "PEO."

2.    For a service fee, PEOs lease employees to their customers, which are small and mid-size employers.

3.    Among other things, PEOs provide their customers with human resources assistance, benefits and workers compensation coverage that the PEO arranges with a licensed insurance company.

4.    At its height, Trend provided these services for its customers collectively having gross annual payrolls of more than $129,000,000.

5.    Trend agreed to rely on Zurich for workers compensation insurance, claims handling and medical management services for both itself and its PEO clients.  This is called a bundled program.

6.    In connection with these services, Trend collected millions of dollars from its clients in order to cover their workers compensation insurance provided through the Zurich program.

7.      Trend failed to then pay that money to Zurich.

**B.      The Parties' Insurance Program**

8.      Zurich provided workers compensation insurance to Trend and Trend's customers for four consecutive loss-sensitive insurance policies spanning from May 29, 2011 through June 1, 2015.  (Trial Exs. Z013, 68-227.)

9.      As part of the insurance program, Zurich issued policies to Trend setting forth the insurance coverage.  (Trial Exs. Z013, 68-227.)

10.      Zurich and Trend also entered into related agreements, including specifications, addenda and amendments to those agreements, setting forth collateral and other terms agreed to by the Parties (the "Program Agreements").  (Trial Ex. Z003.)

11.      In all of its dealings with Zurich, Trend was represented by sophisticated insurance brokers who negotiated the insurance program with Zurich on Trend's behalf.

12.      Leading up to each policy year, Zurich provided Trend with a written proposal of the terms it was offering for the upcoming insurance program.  (Trial Exs. Z005, 7, 8, 11.)

13.      Each year Trend negotiated various terms of the insurance program.

14.      Each year Trend accepted Zurich's proposals containing these terms, and gave Zurich the order to bind the program according to the negotiated terms.

15.      Each year, following the order to bind, Zurich sent Trend written final confirmations (also known as binders) restating the agreed upon terms.  (Trial Exs. Z006, 9, 10, 12.)

16.      For the first three years with effective dates beginning in 2011, 2012 and 2013, Trend's insurance broker was Mark Denman of Robertson Ryan & Associates, Inc.

17.     For the 2011, 2012 and 2013 program years, Mr. Denman, as Trend's agent, negotiated the terms of the insurance program and gave the order to bind coverage according to those terms.

18.     For the 2011, 2012 and 2013 program years, the terms agreed to by Mr. Denman were stated in the final confirmation sent by Zurich.  (Trial Exs. Z006, 9, 10.)

19.     For the fourth year with an effective date beginning in 2014, Trend's insurance broker was Julie Schatz of Roberts & Crowe, Inc.

20.     For the 2014 program year, Ms. Schatz, as Trend's agent, negotiated the terms of the insurance program and gave the order to bind coverage according to those terms.

21.     For the 2014 program year, the terms agreed to by Ms. Schatz were stated in the final confirmation sent by Zurich.  (Trial Ex. Z012.)

22.     For each of the four program years, the parties agreed to a loss sensitive insurance program, meaning that Trend agreed to assume responsibility for a portion of its insurance risk.

23.     In a loss sensitive program, the amounts due for the insurance continue to accrue after the policy expiration date based on how the losses develop over time.

24.     Although the policies generally have one-year terms, due to the nature of certain workers compensation injuries, the coverage provides benefits to injured workers for years and sometimes decades.

25.     The policies are currently active and providing benefits to Trend and its clients' employees.

26.     Zurich faces exposure under the policies that may last decades.

27.     The vast majority of Trend's clients' payrolls were insured under large deductible programs issued by Zurich.

28.     The Parties agreed that Trend would share in the insurance risk presented by its clients by assuming a large deductible obligation.  (Trial Exs. Z003, 13, 68-227.)

29.     For each program year, the parties agreed that Trend would share in the insurance risk presented by its clients by assuming a $500,000 deductible obligation.  (Trial Exs. Z003, 13, 68-227.)

30.     For each program year, the parties agreed that Zurich would pay the claims asserted by injured workers in the first instance.  (Trial Exs. Z003, 13, 68-227.)

31.     Trend would then reimburse Zurich for the first $500,000 of loss incurred for any of the claims, subject to other agreed factors.  (Trial Exs. Z003, 13, 68-227.)

32.     Zurich complied with its obligations under the Parties' contracts.

33.     Zurich has handled and paid the workers compensation claims asserted under the insurance program.

34.     Zurich has sent Trend invoices for the outstanding deductibles and other amounts. (Trial Exs. Z004, 15-47.)

## II.     CHOICE OF LAW

35.     Each of the Program Agreements contains a New York choice of law provision that states that it "shall be governed by and interpreted in accordance with the laws of the state of New York without regard to its choice of law doctrine."  (Trial Ex. Z003.)

## III.    ZURICH'S CLAIMS

36.     The Parties entered into written contracts—the policies and Program Agreements—for each year of their insurance program.  (Trial Exs. Z003, 13, 68-227.)

37.     Zurich has performed under those contracts by, among other things, providing insurance coverage and issuing the required deductible and retrospective premium invoices. (Trial Exs. Z004, 15-47.)

### 1. Principal Due for Unpaid Invoices

38.     Zurich has calculated and issued the required invoices to Trend. (Trial Exs. Z004, 15-47.)

39.     Zurich issued invoices to Trend in accordance with the parties contracts and which are due and owing in the amount of $5,700,719, as stated on the statement of account. (Trial Exs. Z004, 15-47.)

40.     The invoices were properly calculated in accordance with the terms of the Parties' contracts. (Trial Exs. Z003, 13, 15-47, 68-227.)

41.     Trend has not paid the invoices at issue. (Trial Exs. Z004.)

### 2. Accrued Interest on Unpaid Invoices

42.     Applying the applicable New York law, *i.e.*, calculating nine percent interest from the due date of each invoice until November 17, 2016, $521,711 in pre-petition, pre-decision interest has accrued. (Trial Ex. Z004.)

### 3. Zurich's Actuarial Projections Of The Ultimate Amounts Due Under The Insurance Program

43.     The Court is allowing an additional amount to Zurich of **$1,691,000** for projected future claims against Trend.

44.     The Court finds that it should estimate, for purposes of allowance, pursuant to section 502(c) of the Bankruptcy Code, an amount to compensate Zurich for projected future amounts that it is likely to incur and/or pay out, in connection with Trend's workers compensation policies and related agreements.

45.     More specifically, the Court overrules Trend's argument that section 502(e)(1)(B) requires disallowance of any claim of Zurich in this category.

46.    The injured workers' required future medical care and related workers compensation losses are non-contingent, but presently unliquidated.

47.    The Program Agreements are consistent with this interpretation and specifically allow Zurich to accelerate all amounts due under the insurance program upon default by Trend.

48.    Zurich's claims under the policies are liquidated to some extent, but unliquidated and not contingent as to the balance.

49.    While Zurich and Trend are both liable to injured employees under state law, Zurich looks to Trend to pay premiums and deductibles, and beneficiaries look to Zurich to pay benefits.

50.    No policy beneficiary has asserted a benefits claim against Trend's estate.

51.    Section 502(e)(1)(B) states that "the court shall disallow any claim for reimbursement or contribution of an entity that is *liable with the debtor on* . . . the claim of a creditor, to the extent that . . .  such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution."

52.    This Court does not believe that section 502(e)(1)(B) precisely applies here, in the context of these particular loss sensitive policies, where there was essentially an arrangement where Zurich was providing workers compensation coverage to Trend's clients and the clients' employees (*i.e.,* co-employees of Trend) and, as part and parcel to this arrangement, Trend had a *separate obligation to Zurich* to pay the *costs of claims processing* and also *the first $500,000 on any claim*.

53.    There was no evidence that Trend's clients or the employees of those clients (*i.e.,* the co-employees) were making or might make demands *on Trend directly*, such that Zurich

would be paying obligations owing by Trend to the co-employees, and then expect reimbursement from Trend.

54.    Based on:  (a) the totality of the very complex expert testimony on this subject; (b) this Court's responsibility to adopt an estimation approach that promotes a fair distribution among **all** creditors, through a realistic assessment of uncertain claims, and (c) this Court's discretion to determine the allowability of unliquidated and/or contingent claims in accordance with principles of equity, the Court has determined that $1,691,000 is the appropriate estimation of Zurich's future claim amounts.

## IV.    <u>TREND'S DEFENSES</u>

### A.    <u>Defense 1: Program Agreements Issue Resolved On Summary Judgment</u>

55.    Trend's first defense to Zurich's Claim was that the Program Agreements are void under Texas law because Zurich did not file them for approval with the Texas Department of Insurance.  This issue was resolved in favor of Zurich on summary judgment.  (Dkt. 301 at 4-5.)

### B.    <u>Defense 2: The Setoff Defense.</u>

56.    Through its Objection, Trend is asserting a setoff relating to medical cost containment charges.

57.    Trend is not entitled to setoff.

58.    The Court finds that the testimony of Michael Hayden, Dr. Nina McIlree, the deposition transcript of Mark Denman, and expert Joseph Paduda were all very persuasive in demonstrating that these fees were contracted for, Trend knew it, the fees were earned, the fees were justified and not unconscionable, and, to the extent applicable, were within industry standards.

59.    All of Trend's objections and affirmative defenses argues as to this amount are overruled.

### 1. Medical Cost Containment Are In The Insurance Programs

60. The claims handling services provided to Trend by Zurich included a wide range of activities, including claims adjusting, reserving, facilitating return-to-work and related services, communicating with injured employees about the need for medical services and hiring private investigators to monitor the activities of potential malingerers seeking to abuse the workers compensation laws.

61. One of the most important elements of workers compensation claims management is medical management.

62. Medical management services, which may be "bundled" with claims management or purchased separately, actually encompasses many different things, from medical bill review to establishment and management of networks of providers wherein the providers agree to provide care at discounted rates, among other benefits.

63. Among the services Zurich provided to Trend for its insurance program, Zurich conducted medical bill review to ensure a claimant's medical bills were properly coded for the appropriate medical procedure and properly charged according to the relevant state's medical provider fee schedule ("medical cost containment").

64. Medical costs account for approximately 60% of claim expense in workers' compensation.

65. Providers are seeking to maximize their revenue, while payors are interested in minimizing their costs.

66. Medical providers' interests are diametrically opposed to the interests of the parties responsible for funding the providers' invoices.

67. This divergence in interests is exacerbated by the fact that patients and treating providers are making decisions about health care services knowing that the financial costs of their decisions will be borne by third-parties, such as insurance companies or their employers.

68. This is generally called the "third-party payor" problem that bedevils health care cost management.

69. The need for vigilance is obvious.

70. While there may be clinical guidelines, agreements, or even regulations that affect medical services, pricing, rates, and billing processes, providers often generate invoices that are not completely consistent with the services provided or amounts payors believe they are entitled to pay.

71. Parties funding medical services to third parties, such as injured employees, must be vigilant to ensure they are only being held responsible for the services delivered and costs they must bear.

72. This process of reviewing bills to ensure accuracy requires a sophisticated integration and management of people, processes, and technology that collectively delivers significant value to employers.

73. In consideration of Zurich's medical bill review services, Zurich charged 25% of total savings of medical cost containment charges, including for reductions to fee schedule.

74. For example, a payment of $880.85 was ultimately made for a claimant who was billed $2,730 for medical services rendered. This savings of $1,849.15 was due to Zurich's medical bill review practices; Zurich thus charged Trend 25% of that savings, as agreed upon by the parties.

75. Both the proposals and confirmations provided for service fees of 25% of total savings for medical cost containment services. (Trial Exs. Z005-12.)

76. Moreover, charging 25% of total savings for medical cost containment services is an industry standard. The most common pricing methodology and percentage for bill review and networks during the time period 2011-2015 was 25% of savings.

77. The policies and Program Agreements also included medical cost containment charges in the Allocated Loss Adjustment Expense definition. (Trial Exs. Z003, 13, 68-227.)

78. The policies and Program Agreements stated that Allocated Loss Adjustment Expenses will be charged. (Trial Exs. Z003, 13, 68-227.)

79. During its relationship with Zurich, Trend received quarterly reports regarding Trend's medical bill review information. (Trial Exs. Z286, Trend 41-50.)

80. These reports specified Trend's gross medical savings, amounts billed by type for service, and cost management savings and break down these amounts by policy number, claimant name, and site location. (Trial Exs. Z286, Trend 41-50.)

81. The reports further specified that "bill review savings" includes any savings generated from, but not limited to, state fee schedule, fair and reasonable, rule violations, utilization review and denials. (Trial Exs. Z286, Trend 41-50.)

82. The reports further specified that "complex bill review savings" encompasses a second level review by a specialist thoroughly trained in medical bill review auditing, policies and procedures specific to state jurisdictions including relatedness to the compensable Workers' Compensation injury. (Trial Exs. Z286, Trend 41-50.)

83. These reviews may include detailed audits by registered nurses and efforts to negotiate savings beyond standard bill review and network reductions.

84.    Trend communicated with Zurich regarding its cost containment charges and at times contested the cost containment charge amounts.

85.    Trend, however, continued to pay Zurich's invoices that included these medical cost containment charges.

86.    Zurich sent Trend invoices for the outstanding deductibles and other amounts.

87.    Trend received, reviewed and paid Zurich's invoices for several years for its insurance program.

88.    The policies and Program Agreements require Trend to pay "claim adjustment expense."  (Trial Exs. Z003, 13, 68-227.)

89.    The cost to monitor, adjust and pay medical provider bills is a "claim adjustment expense" because Zurich actually incurs costs to provide that service.

90.    Trend could have hired a third-party to provide that service, but it did not.  Trend hired Zurich to provide that service.

91.    That service provided value to Trend, and it was not and is not costless to Zurich.

92.    Zurich is obligated to treat medical cost containment as ALAE with regard to every insured under Texas insurance regulations that adopt the NCCI definition of ALAE.

93.    The same is true with regard to most, if not all, other state insurance regulations.

94.    Like other claim handling expenses such as "attorneys' fees" and "surveillance," expenses allocable as "medical cost containment" are not delineated with precision in the Program Agreements as something provided pursuant to hourly rates, fixed bidding, capped fees or even contingency fees.

95.    Zurich made annual proposals that were accepted four times by Trend and then restated in an annual Final Confirmation document provided to Trend.  (Trial Exs. Z005-12.)

96.     Trend paid in accordance with those Final Confirmations and Proposals year after year after year.

97.     The pricing for medical cost containment were articulated in Proposals that were accepted, bound, documented, charged and paid for numerous consecutive years.

98.     Trend gave its broker Robertson Ryan, the express authority to solicit and negotiate the terms of its workers compensation insurance.

99.     Trend is bound by Robertson Ryan's actions, and, more specifically, Robertson Ryan's agreement with Zurich that Trend would pay 25% of savings for its medical cost containment charges.

100.    Trend agreed pay 25% of savings for its medical cost containment charges.

101.    Trend received quarterly reports detailing the medical cost containment charges.

102.    Trend received other reports detailing the medical cost containment charges.

(Trial Exs. Z239, 286, 287, Trend 41-50.)

103.    Trend continued to pay each invoice issued by Zurich up until April 2015.

### 2.     Expenses Associated With Medical Cost Containment Are Not Unconscionable

104.    Zurich's goal in the medical review process is to pay the appropriate amount for medical services that are delivered for the worker's compensable injury.

105.    The medical cost containment process, including medical bill review, encompasses a complicated superhighway of checks on bills that includes approximately 750 rules coded into the process.

106.    This process allows a bill to go through to be tested or checked at various "off ramps" to make sure that it is paid appropriately.

107. Many of the "off ramps" required a skilled nurse or other individual to personally investigate the bill, the claimant's medical records and any applicable laws, rules and regulations.

108. Zurich undertakes significant effort and expense by employing a combination of manual review by specially trained individuals and computer programs on its cost containment superhighway to ensure accurate payment.

109. Trend is a professional employer organization.

110. Among the services Trend provides to its clients is workers' compensation insurance management.

111. Given that Trend's business is largely focused on providing Zurich's workers' compensation insurance to Trend's clients, Trend's claim that Zurich had a "far better knowledge of workers' compensation claims billing" is not credible.

112. Trend was intimately involved in overseeing its insurance program, especially the handling of its claims.

113. There is nothing about the policies, Program Agreements, proposals, final confirmations or Trend's business that could support a claim of substantive unconscionability.

### 3. Expenses Associated With Medical Cost Containment Are Recoverable And Do Not Deviate From Industry Practice

114. Industry practice is irrelevant to the calculation of medical cost containment charges.

115. The Parties' agreements do not require charges to be computed with respect to industry practice. (Trial Exs. Z003, 5-13, 68-227.)

116. Trend's agreement to pay medical cost containment is not different from its agreement to pay other unspecified expenses such as attorneys' fees.

117. Attorneys' fees vary greatly from engagement to engagement, firm to firm, and jurisdiction to jurisdiction.

118. Zurich does not need to prove any particular lawyers' invoice is consistent with industry practice to recover the costs to defend a workers compensation claim asserted by an insured.

119. Zurich has no obligation to prove its medical cost containment charges are charged in the same manner as its competitors.

120. Zurich's practices regarding medical cost containment are consistent with industry custom and practice.

121. Zurich uses a shared savings model that charges nothing unless savings are achieved.

122. Use of such contingency fees is attractive to Zurich's clients, provides value to Zurich's clients, and is consistent with the approach of other reputable workers compensation insurers.

## V.    **TREND'S CLAIMS**

123. In addition to raising a defense related to medical cost containment charges, Trend also asserts a setoff counterclaim seeking reimbursement for the charges it has paid in the past.

124. Trend's claim in this regard is identical to its defense.

125. Again, the Court finds that the testimony of Michael Hayden, Dr. Nina McIlree, the deposition transcript of Mark Denman, and expert Joseph Paduda were all very persuasive in demonstrating that these fees were contracted for, Trend knew it, the fees were earned, the fees were justified and not unconscionable, and, to the extent applicable, were within industry standards.

## VI.    ZURICH'S AFFIRMATIVE DEFENSES

### A.    The Voluntary Payment Doctrine

126.    Trend seeks a "credit" for amounts it previously paid to Zurich to satisfy charges for medical cost containment.

127.    The evidence shows that Trend paid Zurich's invoices for these charges years ago with full knowledge of the facts and without protest.

128.    Robertson Ryan's knowledge is imputed to Trend, regardless of whether Trend was informed that Robertson Ryan knew of and agreed to such charges on Trend's behalf.

129.    Trend had full knowledge of Zurich's charges for the medical cost containment.

130.    Trend nevertheless paid the amounts without protest.

### B.    Estoppel And/Or Ratification

131.    Trend has accepted the benefits accruing under that agreement.

132.    Trend (1) selected Zurich to be its workers compensation insurer for four consecutive years because it offered Trend the best insurance program available in the market, (2) renewed the insurance program and paid Zurich the annual pay in premium negotiated and agreed to by Zurich and Trend's brokers – Robertson Ryan and Julie Schatz, and (3) believed the pricing its brokers negotiated was one of the best, if not the only, deals available to Trend in the market.

133.    Zurich has paid the applicable losses on all claims made during the policy periods.

134.    By accepting the benefits of the workers compensation insurance program, Trend ratified its brokers' actions in obtaining the insurance policies – including the agreement that Trend would pay 25% of savings for medical bill review.

### VII. ZURICH'S SECURED CLAIM

135.     In its Claim, Zurich asserts a possessory security interest in the $310,413.00 of cash collateral it holds.

136.     Zurich is holding a **$310,413** loss fund that it should be allowed to setoff against amounts Trend owes to Zurich..

### CONCLUSIONS OF LAW

1.     Each of the Program Agreements contains a New York choice of law provision that states that it "shall be governed by and interpreted in accordance with the laws of the state of New York without regard to its choice of law doctrine."

2.     Zurich applies New York law to the claims and defenses.

### I. ZURICH'S CLAIMS

3.     Under New York law, there are four elements to establish breach of contract:  (1) the existence of a contract, (2) the plaintiff's performance pursuant to that contract, (3) the defendant's breach of the contractual provisions, and (4) damages resulting from that breach. *Canzona v. Atanasio*, 988 N.Y.S.2d 637, 639 (App. Div. 2014).

4.     The parties entered into written contracts—the Program Agreements—for each year of their insurance program.  Those contracts created obligations and duties incumbent upon both parties

5.     Zurich has performed under those contracts by, among other things, providing insurance coverage and issuing the required retrospective premium invoices.

6.     Zurich has calculated and issued the required invoices to Trend.

7.     Trend not paid the invoices.

1.      **Principal Due for Unpaid Invoices**

8.      Zurich is entitled to recover the amounts due under the Program Agreements for

unpaid invoices.

9.      Zurich is allowed a claim of **$5,700,719** for invoices that it has issued to Trend in

accordance with the parties' contracts and which are now due and owing, as stated on the

statement of account entered into evidence at the trial.

10.     The court overrules Trend's challenge to the 25%-of-savings fee that Zurich

applied for the process of "bill review" (including charging a 25% of savings fee whenever

Zurich reduced a provider invoice to the so-called fee schedule).  The court finds that the

testimony of Michael Hayden, Dr. Nina McIlree, the deposition transcript of Mark Denman, and

expert Joseph Paduda were all very persuasive in demonstrating that these fees were contracted

for, Trend knew it, the fees were earned, the fees were justified and not unconscionable, and, to

the extent applicable, were within industry standards.  All of Trend's objections and affirmative

defenses argues as to this amount are overruled.

2.      **Accrued Interest on Unpaid Invoices**

11.     Pre-judgment interest is considered a question of substantive law and, in a

contract action with a New York choice of law provision, New York law applies.  *Valley Juice*

*Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 607, 614 (2d Cir. 1996); *Schwimmer v.*

*Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999).

12.     The statutory interest rate in New York is nine-percent per annum, and runs from

the earliest ascertainable date that the cause of action existed, which here is the date each

payment became due.  N.Y.C.P.L.R. §§ 5001, 5004; *Spodek v. Park Prop. Dev. Assocs.*, 719

N.Y.S.2d 109, 110 (App. Div. 2001) (awarding plaintiff pre-judgment interest at the nine percent

statutory rate from the date each payment became due).

13.     Because "the purpose of prejudgment interest is to make an aggrieved party whole," under New York law, awarding prejudgment interest is *mandatory* when a contract is breached, and not merely permissible.  *See City of Binghamton v. Serafini*, 778 N.Y.S.2d 547, 549 (App. Div. 2004); *see also* N.Y.C.P.L.R. § 5001 (a), (b) ("Interest *shall* be recovered upon a sum awarded because of a breach of performance of a contract" and "*shall* be computed from the earliest ascertainable date the cause of action existed.") (emph. added); *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs. P.C.*, 657 N.Y.S.2d 787, 788-89 (App. Div. 1997) (finding lower court erred in denying plaintiff an award of pre-judgment interest).

14.     Bankruptcy courts award pre-judgment interest for a claim adjudicated by the bankruptcy court, and have determined that Section 502(b)(2) does not exclude pre-petition, pre-judgment interest for a claim that is later liquidated or determined post-petition.  *See In re Lamarre*, 269 B.R. 266, 269 (Bankr. D. Mass. 2001) (awarding pre-petition pre-judgment interest on breach of contract claim under Massachusetts prejudgment interest statute similar to the New York statute at issue here).

15.     Pre-petition, pre-judgment interest has been awarded specifically with respect to N.Y.C.P.L.R. § 5001.  *See In re Kovler*, 253 B.R. 592, 602 (Bankr. S.D.N.Y. 2000) (holding that, because the creditor's claim "was essentially one for breach of contract, . . . pre-decision (the January 14 Decision) interest on that claim is mandatory under CPLR 5001 and will be awarded").

16.     Applying applicable New York law, Zurich is entitled to and allowed the sum of **$521,711** for statutory prepetition interest that has accrued, using 9% interest from the due date of each Trend invoice, until November 17, 2016.

### 3. Zurich's Actuarial Projections Of The Ultimate Amounts Due Under The Insurance Program

17.     The Bankruptcy Code requires bankruptcy courts to estimate unliquidated claims "where liquidation of the claim would unduly delay closing of the case." *In re Fairchild Aircraft Corp.*, No. 90-50257C, 1990 WL 119650, at *10 n.21 (Bankr. W.D. Tex. June 18, 1990) ("Section 502(c) is a *mandatory* provision. Contingent and unliquidated claims must be estimated by the court for purposes of a plan, even if noone [*sic*] requests it, in order to go forward with the plan confirmation process itself."); *see also In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1340-41 (5th Cir. 1984).

18.     Courts have wide discretion to determine how to estimate the claim, "'us[ing] whatever method is best suited to the circumstances,'" and considering the "underlying purposes of the Bankruptcy Code." *Brints Cotton*, 737 F.2d at 1341 (citation omitted); *In re Texans CUSO Ins. Grp., LLC*, 426 B.R. 194, 204 (Bankr. N.D. Tex. 2010) (finding estimation to be appropriate where claim potentially represented "most significant non-insider claim").

19.     This District has determined that "a prepetition claim which is unmatured, unliquidated or even contingent on the date of the filing of the petition is still considered a pre-petition claim. If the debt is absolutely owed, but not presently due, or definitely liable but unliquidated it is still a pre-petition debt." *In re Braniff Airways, Inc.*, 42 B.R. 443, 451 (Bankr. N.D. Tex. 1984).

20.     Zurich is entitled to an additional amount of **$1,691,000**, for projected future claims against Trend.

21.     The Program Agreements specifically allow Zurich to accelerate all amounts due under the insurance program upon default by Trend. (Trial Ex. Z003.)

22. The Court concludes that it should estimate, for purposes of allowance, pursuant to section 502(c) of the Bankruptcy Code, an amount to compensate Zurich for projected future amounts that it is likely to incur and/or pay out, in connection with Trend's workers compensation policies and related agreements.

23. More specifically, the Court overrules Trend's argument that section 502(e)(1)(B) requires disallowance of any claim of Zurich in this category.

24. Section 502(e)(1)(B), of course, states that "the court shall disallow any claim for reimbursement or contribution of an entity that is *liable with the debtor on* . . . the claim of a creditor, to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution."

25. This Court does not believe that section 502(e)(1)(B) precisely applies here, in the context of these particular loss sensitive policies, where there was essentially an arrangement where Zurich was providing workers compensation coverage to Trend's clients and the clients' employees (*i.e.,* co-employees of Trend) and, as part and parcel to this arrangement, Trend had a *separate obligation to Zurich* to pay the *costs of claims processing* and also *the first $500,000 on any claim*.

26. There was no evidence that Trend's clients or the employees of those clients (*i.e.,* the co-employees) were making or might make demands *on Trend directly*, such that Zurich would be paying obligations owing by Trend to the co-employees, and then expect reimbursement from Trend.

27. Generally, where "third parties are not competing over the debtor's funds, Section 502(e)(1)(B) is not implicated." *In re Babcock & Wilcox Co.*, 316 B.R. 62, 69 (Bankr. E.D. La. 2003).

28. In this case, Zurich's claims against Trend are not subject to double recovery, as the injured parties either have no claim against Trend or such claims will be paid by Zurich. *See In re MEI Diversified, Inc.*, 106 F.3d 829, 831 (8th Cir. 1997).

29. The Court concludes that section 502(c) is the more applicable statute, and in all events it is appropriate to apply it here. Section 502(c), of course, provides that there shall be estimated for purposes of allowance "any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the case."

30. Section 502(c) serves at least two purposes.

31. First, it is designed to avoid the need to await the resolution of outside disputes or lawsuits to determine the amount owed by means of anticipating and estimating the likely outcomes of those disputes/lawsuits.

32. Second, it is designed to promote fair distribution to creditors through a realistic assessment of uncertain claims. *See First City Beaumont v. Durkay (In re Ford)*, 967 F.2d 543 (5th Cir. 1992); *In re Corey,* 892 F.2d 829 (9th Cir. 1989), *cert. denied sub nom., Kulalani Ltd. V. Corey*, 111 S. Ct. 56 (1990); *In re Continental Airlines Corp.,* 64 B.R. 865 (Bankr. S.D. Tex. 1986).

33. When it comes to claim estimation pursuant to section 502(c)(1), the bankruptcy court may exercise its discretionary powers to determine the allowability of claims in accordance with the principles of equity.

34. Based on: (a) the totality of the very complex expert testimony on this subject; (b) this Court's responsibility to adopt an estimation approach that promotes a fair distribution among *all* creditors, through a realistic assessment of uncertain claims, and (c) this Court's discretion to determine the allowability of unliquidated and/or contingent claims in accordance

with principles of equity, the Court concludes that $1,691,000 is the appropriate estimation of Zurich's future claim amounts.

## II.    TREND'S DEFENSES

### A.    Defense No. 1: Program Agreements Issue Resolved On Summary Judgment

35.    Trend's first defense to Zurich's Claim was that the Program Agreements are void under Texas law because Zurich did not file them for approval with the Texas Department of Insurance.  This issue was resolved in favor of Zurich on summary judgment.  (Dkt. 301 at 4-5.)

### B.    Defense No. 2: The Setoff Defense.

36.    Trend is not entitled to a setoff.

37.    The Court concludes that the testimony of Michael Hayden, Dr. Nina McIlree, the deposition transcript of Mark Denman, and expert Joseph Paduda were all very persuasive in demonstrating that these fees were contracted for, Trend knew it, the fees were earned, the fees were justified and not unconscionable, and, to the extent applicable, were within industry standards.

38.    All of Trend's objections and affirmative defenses argues as to this amount are overruled.

#### 1.    Medical Cost Containment And Loss Cost Factor Fees Are In The Insurance Programs

39.    Trend agreed in the policies and Program Agreements that ALAE charges include the cost to administer a particular claim *as allocated by Zurich*.

40.    This "allocation right" is not limited by the policies or Program Agreements in any way other than an express prohibition on Zurich allocating the costs of employee salaries.

41.    Zurich has the right to allocate expenses to individual claims as it deemed appropriate.

42. The policies and Program Agreements require Trend to pay "claim adjustment expense."

43. The cost to monitor, adjust and pay medical provider bills is a "claim adjustment expense" because Zurich actually incurs costs to provide that service.

44. Trend could have hired a third-party to provide that service, but it did not. Trend hired Zurich to provide that service.

45. That service provided value to Trend, and it was not and is not costless to Zurich.

46. Zurich is obligated to treat medical cost containment as ALAE with regard to every insured under Texas insurance regulations that adopt the NCCI definition of ALAE.

47. The same is true with regard to most, if not all, other state insurance regulations.

48. Under New York law, insurance brokers are agents of the insured for purposes of negotiating insurance terms. *Bohlinger v. Zanger*, 306 N.Y. 228, 231 (1954); *Ribacoff v. Chubb Grp. of Ins. Co.*, 770 N.Y.S.2d 1, 2 (App. Div. 2003); *Evvtex Co., Inc. v. Hartley Cooper Assoc. Ltd.*, 102 F.3d 1327, 1331-32 (2d Cir. 1996) ("Both New York insurance law and common law provide that insurance brokers act as agents on behalf of the insured where they are 'employed by the insured to procure insurance.'") (citations omitted).

49. The status of an insurance broker as the insured's agent has been codified at New York Insurance Law § 2101:

> "[I]nsurance broker" means any person, firm, association or corporation who or which for any compensation, commission or other thing of value acts or aids in any manner in soliciting, negotiating or selling, any insurance or annuity contract . . . on behalf of an insured . . .

N.Y. Ins. Law 2101.

50. Because of the principal-agent relationship, the insured is bound, as principal, by the broker's acts in negotiating and obtaining an insurance policy on its behalf. *Evanston Ins.*

*Co. v. Po Wing Hong Food Mkt., Inc.*, 800 N.Y.S.2d 396, 397 (App. Div. 2005) (insured is bound by broker's action in obtaining the policy on the insured's behalf); *Falcon Crest Diamonds, Inc. v. Dixon*, 655 N.Y.S. 2d 232, 236 (N.Y. Sup. Ct. 1996) (because insurance broker is the insured's agent for the purpose of securing coverage, its representations to the insurer are binding on the insured); *Globe & Rutgers Fire Ins. Co. v. Warner Sugar Ref. Co.*, 187 A.D. 492, 494 (1st Dep't 1919).

51.     Trend gave its broker Robertson Ryan, the express authority to solicit and negotiate the terms of its workers compensation insurance.

52.     Trend is therefore bound by Robertson Ryan's actions, and, more specifically, Robertson Ryan's agreement with Zurich that Trend would pay 25% of savings for its medical cost containment charges. *Ribacoff*, 770 N.Y.S.2d at 2 (insured bound by broker's understanding that jewelry stock insurance coverage was not included in the policy); *Evanston Ins. Co.*, 800 N.Y.S.2d at 397.

53.     Trend agreed pay 25% of savings for its medical cost containment charges.

**2.     Expenses Associated With Medical Cost Containment Are Not Unconscionable**

54.     Under New York law, courts generally require proof that the contract was procedurally and substantively unconscionable when made; "i.e., some showing of an absence of a meaningful choice on the part of one of the Parties together with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10 (1988) (citations and internal quotation marks omitted).

55.     New York law examines "whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 12  (citation omitted).

56.     Trend is a professional employer organization.

57.     Among the services Trend provides to its clients is workers' compensation insurance management.

58.     Given that Trend's business is largely focused on providing Zurich's workers' compensation insurance to Trend's clients, Trend's claim that Zurich had a "far better knowledge of workers' compensation claims billing" fails.

59.     Trend was intimately involved in overseeing its insurance program, especially the handling of its claims.

60.     The policies, Program Agreements, proposals and final confirmations were not unconscionable.

61.     The medical cost containment charges by Zurich were not unconscionable.

### 3.     Expenses Associated with Medical Cost Containment Are Recoverable And Do Not Deviate from Industry Practice

62.     Zurich's practices regarding medical cost containment are consistent with industry custom and practice.

63.     Zurich uses a shared savings model that charges nothing unless savings are achieved.  Use of such contingency fees is attractive to Zurich's clients, provides value to Zurich's clients and is consistent with the approach of other reputable workers compensation insurers.

64.     There is nothing improper about Zurich's medical cost containment charges.

## III.   DEBTORS' CLAIMS

65.     Trend also asserts a setoff counterclaim seeking reimbursement for the medical cost containment charges it has paid in the past.  Trend's claim in this regard is identical to its defense.

66.     For the reasons stated above, Trend's counterclaim fails.

## IV. ZURICH'S AFFIRMATIVE DEFENSES

### A. The Voluntary Payment Doctrine

67. "The [voluntary payment] doctrine bars recovery of payments voluntarily made with full knowledge of the facts and in absence of fraud or mistake of material fact or law." *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 790 N.E.2d 1155, 1156 (N.Y. 2003); *see also Westfall v. Chase Lincoln First Bank, N.A.*, 685 N.Y.S.2d 181, 182 (N.Y. App. Div. 1999) (barring claim where party "paid the subject charges without protest or even inquiry, and were not laboring under any material mistake of fact when they did so") (citng *Gimbel Bros., Inc. v. Brook Shopping Ctrs.*, 499 N.Y.S.2d 435, 439 (App. Div. 1986) (voluntary payment doctrine negated restitution claim because party made payments voluntarily and without objection)).

68. When a party makes payments "without protest or even inquiring and was not laboring under any material mistake of fact when it did so," its claim to a refund of any portion of those payments is barred by the voluntary payment doctrine. *Eighty Eight Bleecker Co., LLC v. 88 Bleecker Street Owners, Inc.*, 824 N.Y.S.2d 237, 239 (App. Div. 2006) (plaintiffs' "marked lack of diligence in determining what its contractual rights were demonstrates that the payments were voluntary and not made under mistake of law.") (citation and internal quotations omitted).

69. Trend paid Zurich's invoices for these charges years ago with full knowledge of the facts and without protest.

70. As a matter of law, Trend cannot argue that it lacked full knowledge of the relevant facts or law.

71. Robertson Ryan's knowledge is imputed to Trend, regardless of whether Trend was informed that Robertson Ryan knew of and agreed to such charges on Trend's behalf. *See, e.g., Ribacoff*, 770 N.Y.S.2d at 2 (insured is "bound, as principal, by notice to or knowledge

acquired by the agent."); *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985) ("[K]nowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it.").

72. Trend had full knowledge of Zurich's charges for the medical cost containment.

73. Trend paid the amounts without protest.

74. The voluntary payment doctrine prohibits Trend from seeking disgorgement of these amounts and asserting them as a setoff. *Dillon*, 790 N.E.2d at 1156.

**B.** **Estoppel And/Or Ratification**

75. Trend is collaterally estopped from denying its insurance agreements with Zurich because it has accepted the benefits accruing under that agreement. *Paramount Ins. Co. v. Brown*, 205 A.D. 2d 464, 465 (N.Y. App. Div. 1994) (insured, by renewing insurance policy without objection for three years and paying premiums, ratified actions of its broker and was estopped from denying validity of insurance contracts); *Evanston Ins. Co.*, 800 N.Y.S.2d at 397 (by paying the initial premium and permitting insurer to conduct an audit consistent with terms of insurance policy, insured ratified policy negotiated and secured by broker); *Barile v. Wright*, 256 N.Y. 1 (1931) (insured ratified agent's act of procuring insurance by reimbursing agent for payment of insurance premiums and making a claim under the policy after suffering a loss).

76. The principles of ratification and estoppel preclude an insured from accepting the benefits of an agreement made by its broker (its agent), but then attempting to prevent the insurer from enforcing the agreement. *See White v. Kenny*, 146 A.D. 803, 803 (App. Div. 1911); *Nat'l Bank & Trust Co. of Norwich v. Woods*, 493 N.Y.S.2d 76, 77-78 (N.Y. Sup. Ct. 1985) ("[O]ne cannot accept the benefits of a contract made by himself or his agent and then attempt to prevent

the other party to the contract from showing what the agreement was or from enforcing the terms of the agreement.").

77.     By accepting the benefits of the workers compensation insurance program, Trend ratified its brokers' actions in obtaining the insurance policies – including the agreement that Trend would pay 25% of savings for medical bill review.  *See Evanston*, 800 N.Y.S.2d at 397.

78.     Because Trend ratified its brokers' agreements, it is estopped from now denying those agreements and the medical cost containment charges contained therein.  *Nat'l Bank & Trust Co. of Norwich,* 493 N.Y.S.2d at 78 (By accepting and retaining the benefits of contract, party was estopped from claiming lack of authority to enter into the agreement or preventing the other party from enforcing the agreement.).

## V.     <u>ZURICH'S SECURED CLAIM</u>

79.     Zurich is holding a **<u>$310,413</u>** loss fund that it should be allowed to setoff against amounts Trend owes to Zurich.

### <u>ORDER</u>

After deliberating on the weight of the evidence submitted on June 22, 23, 28, and 30, 2017, and based upon the Court's assessment of the credibility and knowledge of the nine different witnesses, and in consideration of the foregoing Findings of Fact and Conclusions of Law, the Court has determined that Zurich should and will have an allowed unsecured claim against Trend in the aggregate amount of $7,603,017 (after permitting setoff of its $310,413 loss fund).

### ###End Of Order###